UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BILLY MCCOY,

                Plaintiff,                      Case No. 05-70265

vs.

                                        HONORABLE VICTORIA A. ROBERTS

JO ANNE B. BARNHART,                HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.**      **BACKGROUND**

      Billy McCoy brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

      **A.**      **Procedural History**

      This is an action by the Plaintiff, Billy McCoy, seeking judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB). See 42 U.S.C. §§ 416(I), 423(d).

      Plaintiff originally filed an application for DIB and Supplemental Social Security Income in March 10, 2000, claiming disability since April 15, 1999 (R. 51). This application was denied in an opinion dated September 19, 2001 (R. 231-39). Plaintiff did not appeal this decision, but

reapplied for DIB on July 15, 2002, with a reported disability onset date of April 15, 1999 (R. 263-65).  Plaintiff amended his disability onset date to September 20, 2001, by a letter dated April 15, 2004 (R. 352-56).  This claim was denied in a decision dated July 29, 2004 (R. 17-27), following a April 2004 hearing by Administrative Law Judge ("ALJ") Melvyn B. Kalt (R. 359-92).  The Appeals Council declined review (R. 8-10).

### B.   **Background Facts**

#### 1.   ***Plaintiff's Hearing Testimony***

Plaintiff was 41 years old at the time of the hearing, weighed 180-182 pounds and stood 5 feet 8 inches tall (R. 562-563).  He finished the tenth or eleventh grade (R. 383).  He was last employed as a porter, which entailed cleaning and setting up offices for Lakeside Building Maintenance, where he was employed for 15 years (R. 363-64).  He was injured on the job in 1999 when a table hit him in the back (R. 363-64).  Since that time, he has had pain in his legs, neck and lower back (R. 364).  Plaintiff had pain in his middle and lower back, radiating down the right leg all the way to his toes (R. 365).  He testified that this causes numbness and limping.  The pain was constant, but fluctuated depending on what he was doing.

He could walk one block before stopping due to pain (R. 365-66).  He could sit for about 15-20 minutes before lower back pain would cause him to get up (R.366-67).  He could stand for 10 minutes without pain (R. 367).  He could lift no more than 10 pounds, and only from a table and not from the floor (R. 367-68).  Plaintiff had trouble bending over, and pushing and pulling (R. 368).

To alleviate his pain Plaintiff takes prescribed medicine and lies on the floor (or less frequently the bed) for 15-20 minutes 2-3 times a day (R. 369).  He said that, during an 8-hour

period, he generally spent about 2 hours lying down.  Plaintiff has muscle spasms twice a day, which resulted in pain and a feeling like paralysis for a second (R. 370-71).  He experienced stomach pain and diarrhea as side effects of his medication (R. 371).  He tried to stay still and used a pillow behind his back when sitting to alleviate pain (R. 371-72).  During the night Plaintiff had pain in his leg, back and neck which woke him up (R. 385).  Plaintiff felt that his pain has affected his ability to think properly and caused him to lash out at others.

Plaintiff's primary physician for his back was Dr. Rengachary (R. 372).  Dr. Rengachary recommended that Plaintiff undergo cervical spine surgery, but Plaintiff refused because he was afraid (R. 372-73).  Dr. Rengachary also later recommended that Plaintiff undergo surgery for his lumbar spine, after an August 2001 CT scan revealed deterioration (R. 373, 374).  Plaintiff initially refused this surgery as well due to fear and when he eventually agreed to have the surgery he no longer had insurance due to his divorce (R. 374-77).  He had received a worker's compensation settlement, but they did not pay his medical bills (R. 376).

Plaintiff's everyday pain was about an 8 - 8 ½ on a 10 point scale (where 10 required a visit to the emergency room) (R. 373-74).  He felt that his back problems were worse at the time of hearing (R. 377).

Plaintiff's cervical problems caused headaches almost daily, depending on his activity  (R. 378).  He experienced pain if he turned his head and/or neck the "wrong" way, looked straight up or walked back and looked up.  He wore a neck collar to help with this problem, but needed a higher one which he could not afford (R. 378-79).  The headaches lasted 30-35 minutes, and were cured when Plaintiff took aspirin while sitting and relaxing (R. 380).  His neck pain could radiate into his right arm to his thumb (R. 379).  He was left-handed.  Plaintiff testified that he had difficulty using

3

his left arm and sometimes could not get a good grip (R. 380). Plaintiff's back problem was worse than his neck problem at the time of the hearing (R. 383).

Plaintiff lived with his sister, and his parents and sister helped him financially (R. 381). He attempted to return to work from April to June or July 2003, at a job where he handled weights from 30-50 pounds, but had to stop due to back pain (R. 381-82).

He currently goes to Bible study on Wednesdays, prayer meetings on Friday and church on Sundays, and gets up during the services when he needs to because of pain (R. 385-86).

**2.    Medical Evidence**

An April 28, 1999, cervical spine x-ray revealed marked space narrowing at C6-7, moderate narrowing of C5-6, and neural foraminal encroachments at C6-7 (R. 143). This resulted in a diagnosis of arthritis.

On May 6, 1999, Plaintiff was referred to neurologist M. Zafar Mahmud, M.D. (R. 174). Plaintiff explained that he recently started having pain in his neck radiating to his right arm, which was worsened when he turned to the opposite side and which was accompanied with tingling and numbness. His work required heavy lifting which was difficult because of his symptoms. Plaintiff reported no weakness in his lower extremities. Dr. Mahmud observed no cerebellar signs, some loss of sensation in the right arm, and slightly diminished tricep reflexes on his right side (R. 174-75). Dr. Mahmud determined that Plaintiff had some clinical signs suggesting that his pain was radicular involving the C7 root and he recommended an MRI, a cervical collar, analgesics, an EEG and, if necessary, a neurosurgical consult (R. 175).

A May 28, 1999, cervical spine MRI revealed evidence of a herniated disc at the level of C5-6 and C6-7 eccentric to the right side (R. 140). The cervical spine appeared normal, and there was

evidence of anterior spur formation in the cervical spine indicating moderate degenerative changes. The resulting diagnosis was radiculopathy.

On June 14, 1999, Plaintiff visited Dr. Mahmud for a follow-up and complained of pain in the left side of his neck radiating into his right arm (R. 173). His pain medication was not helping and physical therapy did not completely relieve his symptoms. Dr. Mahmud prescribed a cervical collar and referred him to neurosurgery.

On June 25, 1999, Plaintiff visited Senti Rengachary, M.D., in the neurosurgery clinic for a consultation (R. 223-224). Plaintiff reported that he began feeling pain in his neck in April 1999 one week after an incident involving heavy lifting at his job which involved setting up heavy tables at the Renaissance Center for General Motors. The pain progressed and radiated down his right arm and right thumb. He continued to work until the pain worsened and he began to have numbness in his right thumb. He reported that he had no leg weakness or numbness, but did have some numbness over the lateral aspect of his left leg. Dr. Rengachary's physical examination revealed upper extremity strength to be 5/5, except tricep strength which was 4+/5 on the right[1]; reflexes were 2+ and equal, except tricep on the right, which was absent; decreased sensation in first two fingers and thumb on right hand otherwise sensation was equal; coordination was equal; tandem and gait were steady. Dr. Regenchary recommended physical therapy and, if this did not help, possible surgical intervention (R. 224).

On July 12, 1999, Plaintiff was initially evaluated for physical therapy at TheraMatrix Physical Rehabilitation and reported pain in his neck radiating into his right arm and hand (R. 106). He described the pain as a constant 10/10 and noted that it started one day after work, without any

---

[1]Plaintiff had a lipoma surgically removed from his right arm in the past.

injury as a cause.  His pain was aggravated when he turned his head to the left and lifted his arm.

He experienced difficulty reaching overhead and behind his back with his right arm and turning his

neck to the left.  The therapist observed Plaintiff to have poor posture, forward head and rounded

shoulders, with a lump on his neck that was tender to palpation.  The therapist's short term goals for

Plaintiff were to decrease pain to 6-7/10, decrease radicular symptoms by 25%, increase range of

motion in the right shoulder by 5-10%, increase overhead reach, and independence with home

exercise program (R. 107).

On July 23, 1999, Plaintiff reported to his physical therapist that his neck pain had subsided

to a 6/10 level, and that the radicular symptoms had also decreased, though overhead activity was

still difficult (R. 105).  The therapist indicated that Plaintiff was benefitting from therapy and

recommended continuing the same treatment.

On July 30, 1999, Plaintiff received a nerve block injection administered by Steven Dutcher,

D.O. (R. 135).

On August 6, 1999, Plaintiff reported to his physical therapist that he was experiencing

throbbing pain in his right hand, thumb, index and middle fingers, difficulty with overhead activities,

gripping and grasping (R. 104).  The therapist observed that Plaintiff's neck strength was 4/5, his

shoulder strength was 4/5 in the right and 4 + to 5/5 in the left, all short term goals had been met,

and he or she recommended that Plaintiff continue the same treatment.

After receiving twelve units of physical therapy Plaintiff was discharged from therapy at on

August 27, 1999 (R. 102, 108-126).

Aaron W. Maddox, M.D., saw Plaintiff on October 18, 1999, and noted that an epidural

block and physical therapy had failed and Plaintiff had intractable pain (R. 131).  A number of

largely illegible medical records for the period from September 5, 1997, to November 1, 1999, indicate that Plaintiff was visiting Dr. Maddox on a somewhat regular basis complaining of cervical and low back pain (R. 105-126).

On October 20, 1999, Dr. Maddox diagnosed Plaintiff with cervical radiculopathy and prescribed physical therapy 3 times per week (R. 130).

On October 22, 1999, Plaintiff was evaluated for physical therapy (R. 155). He reported pain in his neck radiating into his right arm and hand with numbness in his right hand. He also complained of pain in his low back into his right leg. He explained that the pain started in September 1999 and that he had no new injuries since that time. His neck pain was 9/10 and his right leg pain was 10/10. The therapist observed that Plaintiff had a limited range of motion in his neck and right shoulder, weakness in his right shoulder muscle and difficulty with overhead activities (R. 156).

On November 22, 1999, after 11 physical therapy sessions (R. 158-168). Plaintiff reported to his physical therapist that he was experiencing pain at 9/10 in the right side of his neck, with a 50% decrease in pain in his right lower extremities and no change in his difficulty with overhead activities (R. 154). The therapist felt that Plaintiff's prognosis was poor, that he had reached a plateau in his progress with therapy and that therapy should be ended.

At a December 3, 1999, follow-up visit Dr. Rengachary found Plaintiff to have restricted straight leg raising test on his right side, restricted neck movements, no spinal tenderness, normal neurological tone in all four limbs, normal muscle bulk, strength of 5/5 in all limbs, hypesthesia in the right L4 distribution, and normal deep tendon reflexes (R. 221). A review of his November 14, 1999, lumbar spine MRI (R. 128-29) revealed a far lateral disc at L4-5 on the right and a central disc

7

prolapse as L5-S1, with significant nerve compression on the L4 nerve root.  Dr. Rengachary recommended that Plaintiff continue physical therapy for four weeks.

On December 9, 1999, Plaintiff visited Dr. Mahmud for back pain he reported having experienced for the past month as a result of lifting a heavy table at work (R. 169).  The pain was radiating and associated with tingling and numbness.  He reported that physical therapy had helped, but that his right leg felt weak.  A neurological exam revealed normal cranial nerves.  A motor system examination revealed no weakness of the right extensor hallucis longus,[2] no cerebellar signs and no weakness of the left lower extremity.  A sensory examination revealed subtle diminution in the pinprick in the L4-5 dermatome.  Reflexes were normal in both upper and lower extremities.  Dr. Mahmud conducted an electroneuromyography which he believed confirmed his diagnosis of L4-5, L5-S1, root lesion (R. 169, 172).

On December 17, 1999, Plaintiff was again evaluated for physical therapy (R. 179).  He reported that he injured his neck at work in April 1999, that his back started to hurt in October 1999 and that he had numbness and tingling down his right arm and right leg.  At this time he was wearing a neck brace, was trying to avoid surgery and indicated that past physical therapy had helped  to alleviate his pain.  His pain level was 8/10 at best and 10/10 at worst, and was relieved with medication and therapy.  The therapist's assessment of Plaintiff was that he had decreased range of motion, strength, tolerance to standing over 10 minutes, sitting greater than 15 minutes and walking greater than 5 minutes, lifting, reaching, dressing and bed mobility and that he should avoid driving and doing chores that cause pain (R. 180).

---

[2]The extensor hallucis longus is one of the anterior leg muscles.  It provides a means of testing the L5 and S1 nerve roots during a neurological examination.

On December 23, and January 6 and 7, 2000, Plaintiff reported to his physical therapist that his neck pain was feeling better (R. 185, 186, 191).

On January 13, 2000, after 12 sessions, Plaintiff's physical therapist indicated that he had reached a plateau in his progress with therapy and recommended therapy be terminated (R. 178). The therapist noted that Plaintiff had met several short term goals of therapy, but no significant long term goals.

On January 28, 2000, Plaintiff visited Kaveh Baremi, M.D., in Dr. Rengachary's office for a follow-up (R. 220). Plaintiff reported that the course of physical therapy had improved his symptoms 50%, and Dr. Barami renewed his prescription for physical therapy for another four weeks. Dr. Barami noted that if the pain was still persistent without significant improvement after this course of physical therapy, surgical options would be discussed.

On February 7, 2000, Plaintiff was again evaluated for physical therapy (R. 200, 215). He experienced pain in his low back radiating into his right foot, with numbness underneath the right foot. The pain had started 2 ½ weeks before, was 8/10 and constant. He reported having trouble with activities of daily living involving trunk flexion and lifting, and poor tolerance to sitting and walking. The therapist observed Plaintiff to have lumbar lordosis (increased lumbar curve), and assessed Plaintiff's condition as limitation of trunk range of motion, difficulty with trunk flexion activities, poor tolerance to standing/walking and difficulty lifting objects (R. 201).

Plaintiff reported no radicular pain in his leg on February 15, 2000, but noted that there was some pain in his right buttock area (R. 208). On February 18, 2000, Plaintiff's back pain was at 3/10 with no radicular pain and some numbness (R. 207). On February 22, 2000, Plaintiff's lower back was feeling better, but his upper back now hurt (R. 206). He reported less pain and numbness down

9

his right leg on February 29, 2000 (R. 204).  By March 2, 2000, Plaintiff reported to his physical therapist that his low back pain was 0/10, and trunk flexion during daily activity was improved 70% (R. 203).  On this date, after 8 sessions, Plaintiff's therapist indicated that he had reached a plateau in his progress with therapy and recommended therapy be terminated (R. 199, 203-215).  Plaintiff had met all his short term therapy goals, his long term goals of decreasing his pain to 2-3/10, restoring full trunk range of motion, achieving trunk flexion in activities of daily living and demonstrating independence with advanced home exercise program, and had "partially" met the goal of decreasing numbness in right lower extremity (R. 199, 201).

On March 3, 2000, Plaintiff visited Satish Rudrappa, M.D. in Dr. Rengachary's office for a follow-up (R. 219).  Plaintiff explained that he wished to continue physical therapy and the use of a cervical collar, to which Dr. Rudrappa agreed.

On April 21, 2000, Plaintiff visited Setti Rengachary, M.D., in the neurosurgery clinic for a follow up (R. 217-218).  Dr. Rengachary's physical examination revealed significant paraspinal muscle spasm in the neck and lumbar spine, restriction of all motions in the neck by 20 degrees, hypesthesia[3] in the right L4 distribution, restricted straight leg raising on the right side and motor strength of 5/5.  Dr. Rengachary discussed surgical options after Plaintiff disclosed his decision to proceed with surgery.  They planned to do the cervical operation first and then, two to three months later, the lumbar operation.

On August 8, 2000, a Disability Determination Service (DDS) physician completed a Physical Residual Functional Capacity Assessment Form and found that Plaintiff had the residual functional capacity (RFC) to: occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or

---

[3]impairment of tactile sensitivity; decrease of sensitivity.

10

walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, push and/or pull

without limitation; occasionally climb, balance, stoop or kneel, but never crouch or crawl (R. 95-96).

Plaintiff was also found to have no manipulative, visual or communicative limitations and was found

to be limited in the environmental capacity only in that he should refrain from contact with hazards

such as machinery and heights (R. 97-98).  Under the heading "Symptoms," the physician circled

the choice which indicated that "the severity or duration of the symptom(s) ... is disproportionate

to the expected severity or expected duration on the basis of the claimant's medically determinable

impairment" (R. 99).

On January 17, 2001, Dr. Rengachary saw Plaintiff for a follow up and surgical counseling

(R. 322).  Plaintiff indicated that he was ready to go ahead with the surgery at this visit.

On August 7, 2001, Dr. Adel El-Magrabi, a consulting physiatrist, evaluated Plaintiff.  He

noted a April 1998 job injury with resulting pain in the back and neck (R. 339).  Therapy provided

only minimal relief.  At this time he stated that his symptoms were worse and denied any other

injuries.  He currently had pain in the back and right hip which radiated to the thigh, leg and foot,

with numbness and spasms.  He had difficulty getting up after prolonged sitting, particularly when

bearing weight on the right foot.  Medication and lying down relieved his symptoms.  He stated that

his right foot felt heavy and cold.  His neck hurt at times and was stiff when pain increased.  He took

arthritis medication, Tylenol No. 3, and Daypro. On examination, he had difficulty with weight

bearing exercises including standing on tiptoe and heel on the right.  He used a standard cane, and

was able to partially squat.  There was lumbar spine curve flattening with decreased flexibility in

flexion, extension, lateral bending and rotation.  There was pain at end range of active spinal

movement, visual spasms in the paraspinal regions, and straight leg raising was positive on the right.

11

The reflexes were comparable, and there was "intact sensory perception on the left and decreased on the right related to various dermatomes."  He reported that "[m]uscle strength was functional distally more than proximally in the right lower extremity."  He also noted that the thighs' girth was 46 cm. on the right and 45 cm. on the left, but the calves were equal bilaterally (R. 339-40).  There was tenderness in the right hip joint, particularly upon stretching (R. 340).  There was decreased cervical mobility and some straightening of the cervical curve.  No change neurologically related to reflexes, sensation, motor power or muscle mass.  The physician's impression was cervical and lumbosacral radiculopathy, cervical and lumbar disc disease, chronic neck and low back pain, and sacroiliitis.  He reviewed the MRI studies of Plaintiff's neck and back, which showed multiple pathological changes in the discs of the neck and back.  He stated that he would manage the symptomatic lumbo-sacral radiculopathy with an epidural steroid block and bilateral paravertebral sympathetic blocks to reduce the hyperactivitity in the nerve roots and reduce inflammation, which would enhance the tolerance of physical activities and increase symptom-free periods.

On August 18, 2001, Plaintiff went to the Bon Secours/Cottage Hospital emergency room complaining of back pain into his right leg for the past week (R. 316-317).  Plaintiff had negative straight leg raising, +2/4 deep tendon reflexes,[4] 5/5 extremity strength bilaterally and a normal gait. A CT revealed right lateral disc herniation at L4-5 and L5-S1 and a large central disc with marked canal stenosis (R. 317, 318).  Plaintiff was given moist heat and pain medication, instructed to follow up with his primary care physician and discharged (R. 317).

On September 11, 2001, Dr. El-Magrabi noted that Plaintiff had been taken to the emergency

---

[4]Deep tendon reflexes are normal if they are 1+, 2+, or 3+ unless they are asymmetric or there is a dramatic difference between the arms and the legs. Reflexes rated as 0, 4+, or 5+ are usually considered abnormal. http://www.neuroexam.com/content_pf.php?p=31

room on August 18, 2001, and placed on Skelaxin for spasms (R. 320).  The pain was aggravated by prolonged weight bearing or sitting and was "decreased temporarily" with rest, changing positions, heat and medication.  Upon examination Dr. El-Maghreb noted pain with extension of the spine, limited spinal flexibility in the lower back, paraspinal tenderness and increased tone on the right, absent right ankle reflex, sensory changes in the right leg and foot, no neurogenic weakness (but strength was affected by initiation of pain).  There was evidence of sciatic tension with straight leg raising on the right and to lesser extent on the left.  There was decreased cervical mobility with straightening of cervical curve.  Dr. El-Maghreb prescribed a steroid block and bilateral lumbar sympathetic blocks, and recommended that Plaintiff see Dr. Rengachary regarding the need for future care and surgery.

On October 5, 2001, Dr. Rengachary reiterated that Plaintiff now wanted to have surgery. Plaintiff described pain starting in the lower back and radiating to the right leg to the plantar surface of the foot.  The pain was aggravated by weight bearing, prolonged sitting, or standing.  With regard to his neck pain, he stated that it was somewhat better, although he reported numbness in the index finger and thumb.  On examination, Plaintiff had impaired sensation at the dorsum of the foot with tenderness of the lower lumbar spine and positive straight leg raising on the right.  Dr. Rengachary noted that the MRI showed that between the lumbar and cervical problems, the lumbar problem at L5-S1 was "markedly worse" with a large centrally herniated disc.  He recommended performing a lumbar laminectomy and microdiscectomy at L5-S1 on the right without a fusion.

On August 6, 2002, Dominic A. Cusumano, III, M.D., of Eastpointe Internists, reported that Plaintiff complained of persistent lumbar pain for 2 years that radiated to the lateral aspect of his right leg (R. 332).  Plaintiff reported that the pain had no aggravating factors.  On examination, Dr.

13

Cusumano noted a normal gait, full range of motion in his neck and all joints, decreased range of motion of the lumbar spine, and normal sensory, motor, and reflex functions (R. 333-34).  His working diagnosis was thoracic or lumbosacral neuritis or radiculitis (R. 334).

On August 12, 2002, Plaintiff saw Angela T. Wilson, PA-C at Eastpointe Internists, and she reported a limited range of motion of the lumbar spine, normal sensation, 4/5 reduced muscle strength in the right lower extremity, and normal reflexes (R. 330).  Plaintiff was given prescriptions for Darvocet-N and Prednisone by Dr. Cusumano (R. 331).  However, when Plaintiff returned to see Ms. Wilson on August 28, 2002, she observed a reduced range of motion in the lumbar spine and normal, sensory, motor, strength, and reflex examinations (R. 327).

When Plaintiff returned to Eastpointe Internists on October 1, 2002, Tammera Secorski, M.A. noted that Plaintiff's main complaint was shoulder pain occurring in a persistent pattern for one week (R. 323).  The examination showed a normal gait, normal range of motion in the joints, decreased range of motion in the spine, and normal sensory, strength, and reflex examinations (R. 324).

On November 26, 2002, Plaintiff reported to Eastpointe Internists with a moderate level of arm pain that had been gradual and persistent for about 4 weeks (R. 347).  He also stated that he was having lower back pain radiating into his right leg.[5]  Ms. Wilson noted a normal gait, full range of motion in the neck and all joints, normal joints and muscles,   and a normal neurological examination, including normal sensory, motor, and reflex functions (R. 347-48).  Plaintiff was given Prednisone and Darvocet-N 100 (R. 348).

---

[5]This record indicates a history of back surgery, but this is the first and last mention of such and it is therefore believed that this is merely a typographical error or a history taking mistake.

14

On January 8, 2003, a DDS physician reviewed the medical record with regard to Plaintiff's condition since September 20, 2001 (R. 307-14).  The physician concluded that Plaintiff had the RFC to lift 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday with a sit/stand option and normal breaks and lunch (R. 308).  Plaintiff could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance and stoop; and occasionally kneel, crouch, and crawl (R. 309).  He could not do overhead work with either upper extremity, could not do constant but only frequent fingering work (R. 310), and he needed to avoid all exposure to hazards, such as moving machinery, heights, and commercial driving (R. 311).  The state evaluator noted that Plaintiff's allegations of pain were only partially credible due to his level of daily activity, his refusal to have corrective surgery, and the relief he sustained from pain medication and physical therapy (R. 312-13).

Plaintiff returned to Eastpointe Internists on January 30, 2003, at which time he stated that the pain came and went, but was worse with cold weather (R. 344).  Ms. Wilson reported that, on examination, Plaintiff had a normal gait, full range of motion in his neck and all joints, and a normal neurological examination (R. 345).  Plaintiff was to take Motrin as needed (R. 346).

Plaintiff was seen at Eastpointe Internists on July 21, 2003, (R. 341) and reported experiencing a sudden onset of back pain two weeks previously precipitated by heavy lifting.  The symptoms were "aggravated by exertion, rest, weight lifting, prolonged standing, prolonged sitting and lying down", and had "no relieving factors"(*id.*).  On examination by Ms. Wilson, Plaintiff had a normal gait, full range of motion in his neck and all joints, normal joints and muscles, paraspinal muscle spasm, and a normal neurological examination (R. 342).  Plaintiff was given Prednisone,

Robaxin, and Celebrex (R. 343).

On February 27, 2004, Noel H. Upfall, M.D., a family practice physician, examined Plaintiff and reported that he had a long history of back and neck spasms for which he took Tylenol No. 3 every 4-6 hours, as well as Motrin and Flexeril (R. 357). The musculoskeletal examination showed a good range of motion with no deformity. The deep tendon reflexes were normal and symmetrical in the upper and lower extremities. Dr. Upfall diagnosed back and neck pain and a ruptured disc based on the November 1999 MRI (R. 357- 58).

### 4.   *Vocational Evidence*

Lawrence S. Zatkin served as the vocational expert (VE) in this matter (R. 20). ALJ Kalt first asked VE Zatkin whether there would be any work that Plaintiff could perform if his testimony were fully credited (R. 387). VE Zatkin responded that Plaintiff's testimony regarding his need to lie "recumbent on the floor up to two hours a day ...during the work period, it's going to preclude him from work" (*id).*

ALJ Kalt next asked VE Zatkin to consider whether there was work that Plaintiff could perform assuming he had the following limitations: lifting up to 10 pounds; performing no repeated fine manipulations; inability to use left hand above shoulder height; inability to concentrate on anything more than simple 1, 2, and 3 step operations and requirement for a sit/stand option (R. 387). VE Zatkin testified that Plaintiff could perform a limited number of sedentary jobs with a sit/stand option, and indicated that there were 4,500 such jobs in Southeast Michigan, which were described as simple cashiering, information clerk and surveillance monitoring (R.388).

When questioned by Plaintiff's attorney whether these jobs would be precluded for a employee that required 2 days off each month due to pain, VE Zatkin answered that they would

16

because an employer could terminate employment if an employee exceeds 15 sick days per year (R. 389).

###### 5. *The ALJ's Decision*

The ALJ found that Plaintiff met the disability insured requirements of the Act at all times relevant to the decision and had not engaged in substantial gainful activity since his alleged onset date (R. 26). Plaintiff had the severe impairments of ruptured cervical and lumbar discs and cervical and lumbosacral radiculopathy, but he did not have any impairment or combination of impairments that met or equaled the criteria of an impairment in the Listing of Impairments. Plaintiff's allegations regarding his limitations were not fully credible.

Plaintiff had the residual functional capacity (RFC) for unskilled entry level work where he lifted up to 10 pounds; performed no repeated fine manipulations, did not use his dominant left upper extremity above shoulder level; was not required to concentrate on anything more than simple one, two and three step operations; and was allowed to alternate between sitting and standing at his own option (R. 27). Plaintiff was unable to perform his past relevant work and had no transferrable skills.

Finding that Plaintiff had the RFC to perform less than the full range of sedentary work, ALJ Kalt used the Medical-Vocational guidelines as a framework, together with the testimony of the VE, to find that Plaintiff could perform a significant number of jobs in the economy and was, therefore, not disabled.

## II. ANALYSIS

### A. Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[6] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.   Factual Analysis

Plaintiff raises three challenges to the Commissioner's decision: (1) the ALJ erred in not finding that Plaintiff's impairments met or equaled Listing 1.04A; and (2) the ALJ failed to properly take into account Plaintiff's complaints of pain at Step 5 of the sequential analysis; and (3) the ALJ erroneously assessed Plaintiff's credibility, which will be considered together.

_____

[6] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant.").

18

1. ___Listing 1.04A___

ALJ Kalt determined that Plaintiff did not met Listing 1.04A because his back problems were not so severe as to interfere with his ability to ambulate effectively. Inability to ambulate effectively using an assistive device requires use of both hands such as on a walker, two canes or crutches, and Plaintiff uses a single cane (R. 339). [7] The introductory section for all Musculoskeletal System listings (which includes Listing 1.04A), 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00., in Subsection 1.00(B)(2) entitled "How We Define Loss of Function in These Listings," explains that all musculoskeletal system impairments require either (a) an inability to ambulate effectively or (b) an inability to perform fine and gross movements effectively, and that this inability must have occurred on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, for at least 12 months in order to be considered disabling. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2). This introductory language suggests that ALJ Kalt may be correct that

---

[7]     Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning ... to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P. App. 1, 1.00(2)(b)(1).

There is no evidence in the record that Plaintiff has ever required the use of hand-held assistive device(s) that would limit the functioning of both upper extremities, though he did indicate in his *Pain Questionnaire* that he used one cane and, when he lost the cane, a stick, for "balance and pain relief" when walking (R. 298). Yet this would not limit functioning in both upper extremities and, therefore, it does not appear that Plaintiff would meet the criteria for ineffective ambulation, especially considering the fact that his gait is described as normal by his physicians on numerous occasions in the record and no hand-held devices have been prescribed.

whatever the "cause" of the musculoskeletal system impairments, as later set out in specific listings such as 1.04A, the vocationally significant consequences of this "cause" in order to warrant an automatic finding of disability and an award of benefits must be either an inability to ambulate or an inability to perform fine and gross movements effectively.

Plaintiff argues that the precise listing 1.04A does not repeat either restriction on inability to ambulate or perform fine or gross movements effectively, and thus does not require this separate finding.  Some of the listings, such as 1.02A, 1.02B, 1.03, 1.05B, 1.05C , 1.06 do repeat and specifically include either the restriction on inability to ambulate or the restriction on performing fine or gross movements effectively, and others do not  – 1.05A amputation of both hands, 1.05D Hemipelvectomy or his disarticulation, 1.07 certain fractures with non-unions, 1.08 soft tissue injuries (*e.g.* burns) requiring prolonged management to restore some "major function."  It appears that those repeating the hand or walking limitation use it as a measure of the degree of the specific impairment.  In those not mentioning the additional hand or walking limitation most of these are obviously so severe in themselves as to clearly entail severe vocationally relevant functional limitations.

Yet, even if the Plaintiff is correct that the ALJ was wrong on this added requirement in 1.04A, the error appears harmless on the current record because the record does not support a finding under listing 1.04A particularly considering the 12 months durational requirement for each of the listed measures.[8]  Listing 1.04A requires a showing of an extreme spinal impairment, and courts rarely reject the Commissioner's decision under this listing.

---

[8] *Wilson v. Commissioner of Social Sec*. 378 F.3d 541, at 547  (6th Cir. 2004) citing *NLRB v. Wyman-Gordon,* 394 U.S. 759, 766 n. 6 (1969) (plurality opinion) notes the limited area of harmless error in administrative reviews.

20

Further, "for a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify," *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990), and the record does not support Plaintiff's allegation that he has sustained sensory or reflex loss as required to met or equal Listing 1.04A.[9] Although Plaintiff points to three abnormal reports in this category – an August 7, 2001, report of decreased sensory perception (R. 339), a September 11, 2001, report of absent right ankle reflex and sensory changes to the right leg (R. 320) and an October 5, 2001, report of impaired sensation in the dorsum of his foot (R. 321) – there are a great many more records observing normal sensory and reflex examinations subsequent to his September 20, 2001, disability onset date – August. 6, 2002 (R. 334), August 12, 2002 (R. 330), August 28, 2002 (R. 327), October 1, 2002 (R. 324), November 26, 2002 (R. 348), January 30, 2003 (R. 345), July 12, 2003 (R. 342) and February 27, 2004 (R. 357). Similarly, on Listing 1.04A's requirement of muscle weakness, there were normal or near normal findings on August 12, 2002 ("4/5" in right leg only)(R. 330), August 28, 2002 (R. 327), October 1, 2002 (R. 324), November 26, 2002 (R. 348) and January 30,

---

[9]    § 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)
....

20 C.F.R. Pt. 404, Subpt. P, App. 1

2003 (R. 345).

Again the disability regulations and Musculoskeletal System listings establish that a claimant must provide evidence that their impairment has lasted or is expected to last for a continuous period of at least 12 months, 20 C.F.R. § 404.1525(a). Plaintiff's medical records do not support a sustained period of muscle weakness and sensory or reflex loss. In sum, there is ample evidence in the record to support a finding that Plaintiff's impairment does not meet all of the requirements of Listing 1.04A and, therefore, this matter should not be remanded for a determination of this issue even if this Court were to determine that ALJ Kalt's stated basis for finding that Plaintiff's impairment did not meet the Listing was insufficient.

### 2. *Use of Plaintiff's Subjective Pain Complaints at Step 5*

The Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 852 (6th Cir. 1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir.1981); *Jones v. Commissioner of Social §*, 336 F.3d 469, 476 (6th Cir., 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

The Commissioner's regulations specifically state:

> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your

22

> symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

29 C.F.R. § 404.1529(c)(2).

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. SSR 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific. "[S]trict reliance on objective medical evidence is ... contrary to the law of this circuit." *Beeler v. Bowen,* 833 F.2d 124, 127 (8th Cir. 1987); "an ALJ may not discount [subjective complaints] solely because of lack of objective medical evidence." *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985). The ALJ must say more than that the testimony on pain is not credible. *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude:

> Based upon an overall evaluation of the relevant written evidence of record as summarized above, the undersigned finds it does not contain the requisite clinical, diagnostic or laboratory findings to substantiate or form the underlying basis for claimant's testimony regarding totally disabling pain and other disabling impairments.
> . . .

*Id.* at 1039.

The record in this matter indicates that the ALJ did attempt to consider the subjective evidence presented by Plaintiff in this matter in support of his impairments and limitations.

Plaintiff alleges that the ALJ discredited his position regarding his inability to work based upon his ability to undertake personal care and household tasks (Plaintiff's Brief, pp. 16-17). A fuller statement of the above noted S.S.R. 96-7p standard for an administrative law judge's credibility findings is as follows:

23

> The adjudicator must consider the entire case record and give specific
> reasons for the weight given to the individual's statements. The
> finding on credibility of an individual's statements cannot be based
> on an intangible or intuitive notion about an individual's credibility.
> The reasons for the credibility finding must be grounded in the
> evidence and articulated in the determination or decision. It is not
> sufficient to make a conclusory statement that "the individual's
> allegations have been considered" or that "the allegations are (or are
> not) credible." It is also not enough for the adjudicator simply to
> recite the factors that are described in the regulations for evaluating
> symptoms. The determination or decision must contain specific
> reasons for the finding on credibility, supported by the evidence in the
> case record, and must be sufficiently specific to make clear to the
> individual and to any subsequent reviewers the weight the adjudicator
> gave to the individual's statements and the reasons for that weight.
> This documentation is necessary in order to give the individual a full
> and fair review of his or her claim, and in order to ensure a well-
> reasoned determination or decision.

Further, because the ALJ was present during Plaintiff's testimony and could evaluate his demeanor, this Court must exercise a degree of deference and limit its role to evaluating whether or not the ALJ's explanations for discrediting Plaintiff was reasonable and supported by substantial evidence in the record. *Jones*, *supra*, 336 F.3d at 476.

Plaintiff indicated in his *Daily Activities Form* that he does housework including laundry (daily), some dusting, washing dishes (daily), minimal mopping, vacuuming and making the bed (R. 300). He also indicated that he accompanies his wife shopping for 2-4 hours at a time, fishes 4 times per month, swims 2 times per month and attends church and Bible study weekly (R. 300-301). Plaintiff argues that this level of activity does not equate to substantial gainful employment, and should also not be used to discredit Plaintiff's complaints of disabling pain (Dkt. #7, p. 17). Plaintiff cites the Massachusetts District Court and Eighth Circuit for the proposition that ones ability to complete personal care and household tasks does not constitute evidence that one is

24

necessarily able to engage in substantial gainful employment (Plaintiff's Brief, p. 17).  Yet the Sixth Circuit has said that the ALJ could "properly determine that [a claimant's] subjective complaints were not credible in light of [their] ability to perform other tasks."  *Heston v. Comm'r of Soc. Sec.* 245 F.3d 528, 536 (6th Cir. 2001).  Further, Plaintiff's daily activities were not the sole basis on which ALJ Kalt determined Plaintiff's RFC.

In addition to the daily activities that Plaintiff's counsel suggests were unfairly evaluated in determining Plaintiff's RFC, the ALJ commented in the body of his decision on a number of other things he felt related to Plaintiff's credibility.  He did not merely rely on his testimony and application answers regarding his ability to perform personal care and household tasks.  For instance he correctly pointed that Plaintiff claimed to walk with a limp, but that this was not observed by his physicians and physical therapists (R. 23).  Certain other examples on which he relied in questioning Plaintiff's credibility, however, were apparently based upon a faulty review of Plaintiff's lengthy medical history.  ALJ Kalt stated that Plaintiff's allegation that he used a cervical collar was not supported by the medical record (R. 23).  Yet there is documentation that a cervical collar was prescribed for Plaintiff repeatedly, and as late as March 2000 (R. 175, 173, 179, 219).  He also erroneously read an August 6, 2002, medical report to say that Plaintiff was found to be able to conduct his daily life activities and control his pain with medication, when the report actually had listed those items as goals for Plaintiff (R. 23, referring to R. 334).  And the last questionable observation has to with Plaintiff's sleep pattern.  ALJ Kalt found it noteworthy that while Plaintiff testified that he was unable to sleep, his daily activity form indicated that he slept from 11:00 p.m. until 7:00 a.m. (R. 24, referring to R. 299).  Yet he failed to mention that in the form Plaintiff  went on to explain that this period of sleep was disrupted with "running pains, aching [and] stabbing pains

25

in my legs, arms [and] neck" (R. 299).

Yet while Plaintiff need not provide objective evidence confirming the severity of the alleged pain, he has burden of establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain.[10]

Here, Plaintiff has substantial objective and clinical diagnostic evidence of underlying herniated lumbar and cervical discs with root impingement confirming his diagnosis of a severe "underlying medical condition." As in most cases, there is no objective evidence of the pain itself for the relevant time period. Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." His subjective evidence and extensive and relatively consistent treatment history is central to this analysis. Yet, the evidence is not unequivocal. For instance, there are two state agency physicians' Residual Functional Capacity Assessment forms concluding that Plaintiff can perform a range of sedentary work, only the most recent of which will be addressed (R. 307-314).

Plaintiff argues that the state agency physician's report in this matter should be discounted because it was completed in January 2003, is based on a partial record and was given by a non-examining doctor (Dkt. 15, pp. 3, 4-5). SSR- 96-6p directs that an ALJ *must* consider and address the decision of state agency consultants in their opinions as medical opinions from non-examining sources, and should obtain an updated medical opinion from a medical expert to supplement a state

---

[10] *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e) (requiring claimants to provide all medical evidence in support of their claims).

agency medical consultant only *when the ALJ believes* that a finding of medical equivalence is required (SSR 96-6p, p. 3-4). It also requires an updated medical opinion only "[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical . . . . consultant's finding that the impairments is not equivalent in severity to any impairment in the Listing of Impairments."

Here, the January 2003 report refers to the August 2001 CT scan which revealed that Plaintiff's L5-S1 herniation had progressed, as compared to the November 14, 1999, MRI, as well as all of the treatment records up to the date of the report (R. 309). There are no diagnostic tests in the record subsequent to the January 2003 DDS report which indicate a permanent change in Plaintiff's condition. The only subsequent medical report of note is the July 21, 2003, report which shows that Plaintiff suffered an episodic bout of back pain following some heavy lifting (R. 342-343). This was apparently the result of his several month effort starting in April 2003 to work at United Fish Distributor which he described at his hearing (R. 381). Surely it is commendable that he would attempt to return to work during this  period, particularly given his economic need to reestablish health insurance coverage, yet, if Plaintiff's impairments through the relevant period of alleged disability starting in September 2001 were as severe as Plaintiff contends, a reasonable fact finder might question why in April of 2003 he tried to return to work involving lifting 30-50 pounds (R. 381). As noted above, the Sixth Circuit in the *Heston* case allows subjective complaints to be discounted in light of other tasks a claimant performs. It is apparent, Plaintiff in 2003 was performing not just light and sedentary tasks, but medium exertional tasks which clearly aggravated his problems. Again, an August 2002 medical reports indicated that Plaintiff's lumbar pain was precipitated by "heavy weight lifting" (R. 332). A reasonable fact finder could interpret this as

27

evidence Plaintiff was in mid-2002 pushing himself well beyond the exertional capacity of a disabled

person.   In order to perform the jobs the VE identified, only a limited range of sedentary exertional

ability is required.

Therefore, there is sufficient evidence for the ALJ to have discounted Plaintiff's credibility

to the extent that he found Plaintiff capable of performing a limited range of sedentary jobs with a

sit/stand option ( R. 387).[11]   Further, ALJ Kalt's hypothetical question adequately accommodated

the Plaintiff's significant impairments that were found credible.   Accordingly, VE Zatkin's response

that such a person could perform 4,500 cashiering, information clerk and surveillance jobs in the

region and 9,000 state wide serves as substantial evidence for a finding that Plaintiff can perform a

substantial number of sedentary jobs and is thus not disabled.

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary

Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.   The parties to

this action may object to and seek review of this Report and Recommendation, but are required to

file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §

636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of

any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

---

[11]ALJ Kalt did decide to expand Plaintiff's RFC beyond what the DDS physician had recommended - the DDS physician's gave Plaintiff the RFC to lift less than10 pounds frequently, and no overhead lifting bilaterally while ALJ Kalt gave Plaintiff the RFC to lift 10 pounds and restricted overhead lifting only for the left arm - but this too is supported by substantial evidence in the record.  Plaintiff testified that he could lift 10 pounds (R. 368).  Plaintiff also only testified to limitation in the use of his left (R. 379-380), a complaint that is not documented elsewhere in the record, and the medical records do not indicate a loss of range of motion or muscle strength in either arm observed by any of Plaintiff's treators.

*Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections which raise some issues but fail to raise others with specificity, will not preserve

all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231,

829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections

is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response. The response shall be not more than twenty (20) pages in length unless

by motion and order such page limit is extended by the Court. The response shall address

specifically, and in the same order raised, each issue contained within the objections.


Dated: December 30, 2005                              s/Steven D. Pepe
Ann Arbor, Michigan                                  UNITED STATES MAGISTRATE JUDGE




Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys and/or parties
of record by electronic means or U. S. Mail on December 30, 2005.

                                            s/John Purdy
                                            Deputy Clerk


29